UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YASSIR ROUSAN,<br><br>          Plaintiff,<br><br>          v.<br><br>BANKERS LIFE AND CASUALTY<br>COMPANY, AND DOES 1 THROUGH 20,<br>INCLUSIVE,<br><br>          Defendants. | 1:06-cv-01175 OWW GSA<br><br>MEMORANDUM DECISION AND<br>ORDER DENYING DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT,<br>OR ALTERNATIVELY, PARTIAL<br>SUMMARY JUDGMENT (DOC. 21) |

## I. INTRODUCTION.

Plaintiff Yassir Rousan ("Rousan") brings this action under California Government Code § 12940 alleging employment discrimination based on religion and national origin by his former employer, Defendant Bankers Life and Casualty Company ("Bankers Life").  Plaintiff alleges he was fired from his position as a branch sales manager ("BSM") of the Fresno branch office of Bankers Life because of his Muslim faith and Middle Eastern ancestry.

Before the court for decision is Defendant's motion for summary judgment on the complaint, or in the alternative, partial summary judgment on Plaintiff's claim for punitive and exemplary

1

damages.   First, Defendant argues Plaintiff's discrimination claim fails as a matter of law because: 1) Plaintiff cannot establish a prima facie case of discrimination, 2) even if Plaintiff could establish a prima facie case, the evidence shows a non-discriminatory motive for Plaintiff's termination, and 3) given Defendant's showing of a non-discriminatory motive, the burden shifts back to the Plaintiff and he lacks sufficient evidence to demonstrate Defendant's reasons were pretextual. Second, Defendant asserts Plaintiff's claim for punitive and exemplary damages fails as a matter of law because Bankers Life's conduct was neither oppressive, fraudulent nor malicious.

Plaintiff opposes the motion, arguing a triable issue of fact exists as to whether Rousan performed his job satisfactorily, whether Bankers Life decisionmakers had a discriminatory motive, and whether the reasons for termination were factually baseless and pretextual.

## II.  FACTUAL BACKGROUND.

**A.   Plaintiff's Employment History with Bankers Life.**

Plaintiff Yassir Rousan was born in Amman, Jordan and is of Middle Eastern ancestry.  (Complaint at ¶14.)  He is a practicing Muslim.  *(Id.)*  He began his employment with Bankers Life at its Stockton branch office as an agent in 1991.  (Doc. 1-2, Defendant's Statement of Undisputed Facts ("DSUF") #1.)  He was recruited by Bader Khairallah, the BSM for the Stockton branch, who later recommended Plaintiff for a promotion to a BSM position.  (DSUF ## 1 & 3.)  Mr. Khairallah, and several other BSMs in the region, are also Muslim.  (DSUF #2.)  In 1997, upon

Khairallah's recommendation, Bankers Life Field Vice President William Klein interviewed and hired Rousan as the BSM in the Fresno office.  (DSUF ## 3 & 4.)  As a BSM, Rousan was responsible for the performance of the Fresno office and for recruiting, training, and maintaining a sales force.  (DSUF #5.) Klein was Rousan's immediate supervisor.  On July 15, 2003, Rousan was terminated from his position with Bankers Life.

B.    Performance Measurement at Bankers Life.

Bankers Life contends it set annual goals for each branch office for production and recruiting and that the performance of each office was monitored by objective metrics.  (DSUF #6.) Production was tracked by measuring premiums received and commissions generated.  (*Id.*)  The amount of first-year commission generated by a branch is known as "agent production credit" or APC.  (DSUF #7.)  On a yearly basis, the Chicago home office assigned the Fresno office an annual goal for APCs, which is a measure of overall production.  (DSUF #8.)  BSMs were also measured by their ability to increase sales of their agents and to recruit and develop new agents.  (DSUF #10.)  Each month Bankers Life tracked the total number of agents employed in each branch and new agent contracts.  (DSUF #12.)  It also monitored the development of new agents by tracking "successful new agents" ("SNAs"), who are newly recruited agents who achieve a strong level of production sustained over a period of three months. (DSUF #13.)  Bankers Life maintains that BSMs were assigned monthly goals for recruiting and developing SNAs by the home office.  (DSUF ## 14 & 15.)

Plaintiff counters that overall production was the main metric used to measure BSM performance and that recruiting and SNAs were secondary issues.  Rousan testified that in the thirteen years he worked at Bankers Life, production numbers were the most important factor when it came to retaining employees or letting them go.  (Plaintiff's Separate Statement of Additional Undisputed Material Facts "PSSUF" #75.)  He points out that Bruce Baksis, a branch sales manager and Rousan's regional director at the time of his termination, testified that he understood that BSM performance was measured by "growth" and that the company expected annual growth of 7 to 15 percent.  (PSSUF #78.)  Baksis testified that he understood that a BSM who grew his office between 7 and 15 percent was secure in his job.  (Id.)  Rousan contends that Bankers Life told him to celebrate if APC annual growth was in the double digits. (PSSUF #79.)

Klein testified that, in order for Rousan to avoid termination, "[h]e would have needed to demonstrate the ability to recruit and develop new agents and to begin to regrow the branch sales office."  (PSSUF #109.)  Plaintiff notes that Klein testified that growth was key in measuring BSM performance:

> Q: Understand. Let me ask you this: What is an acceptable level of growth? You know how you talked about the most important thing in measuring performance of a BSM is growing the company or growing branch.
>
> A: Uh-huh.
>
> Q: What's an acceptable level of growth from one year to another?
>
> A: I don't know that I could give you that.  We – every branch has goals that they're strive – they're supposed to strive to meet on a yearly basis.
>
> Q: Right.

**4**

A: I mean, I can give you a more generalized answer than a specific.  In that over a course of time, a sales organization is supposed to look like an upward tracking on a graph.

Q: Uh-huh.

A: And much like the stockmarket, there are ups and down along the way, but overall the tracking should be in a positive direction.

Q: So there's no set — I mean, if we were to look through all the company's documents, I wouldn't find any document that says a BSM has to grow at X percent in order to be considered a consistent performer?

A: Correct.

Q: Okay.  So it's just basically a case-by-case basis.

A: I don't even know that I'd say it's a case-by-case basis, but I — I guess if I did not have consistent growth over 19 years, I probably wouldn't be sitting here, so yeah, I guess you could say that.

Q: Okay. So when it came to the BSMs in your territory in 2002 and 2003, do you remember discussing the rate of growth with any of the BSMs and what was acceptable?

A: Two questions there. The first part, yes.  We talk about the rate of growth or lack of growth in —

Q: Yes.

A: — in our individual sessions — our group sessions. But we don't talk about acceptable lack of growth.

Q: It just needs to be in an upward trend?

A: We're looking at — yeah. We're looking for growth.

Q: Okay. So there really was no specific rate of growth discussed with BSMs, it was just upward trends?

A: No, no.  There are — there are goals that are established for every office.  Those are the targets that are hit for a territory, for a branch every year. If — if people are struggling towards those targets, we — we would still be talking about hitting those targets and coming up with plans to hit that goal.

Q: But so long as it was an upward trend, that would be —

1   **A: Now, that's what I — I — that's what I would be more
    concerned with.**

2

**(Klein Depo. at 65-66.)**

3

4   Plaintiff asserts that his APCs and income increased each

5   year.  (PSSUF #80.)  In 2002, Rousan contends his branch's APCs

6   grew by 16 percent over the previous year.  (PSSUF #81.)

7   Rousan's compensation was directly linked to his production and

    his compensation grew substantially in the years prior to his

8   termination.  (PSSUF #82.)  In 2000, Rousan earned $106,438.

9   (Id.)  In 2001, Rousan earned $112,126 and in 2002, he earned

10  $146,835.  (Id.)  In 2003, Rousan earned $83,099 working only six

11  and a half months and claims he was on track to early

12  approximately $160,000.  (PSSUF #83.)

13

14

15  **C.   Recruiting and Successful New Agents (SNAs).**

16      For the Fresno office in 2002 and 2003, Bankers Life

17  contends the SNA goal was one SNA each month or 12 total for the

18  year.  (DSUF #15.)  Bankers claims the headcount at the Fresno

19  office remained stagnant in 2002 and 2003 despite Klein

20  emphasizing to Rousan the importance of developing new agents.

21  (DSUF #16.)  To the extent Rousan sought new recruits, they did

    not develop into successful new agents.  (DSUF #17.)  By April

22  2002, the Fresno office had not developed any SNAs and Klein

23  reminded Rousan of the importance of building a sales force and

24  meeting the 2002 goal of 12 SNAs for the year.  (*Id.*)

25      Bankers Life claims that in June 2002 Neil Koranda, a BSM

26  Klein appointed to conduct site visits of different offices in

27  order to improve performance, submitted a report to Klein that

28

described Rousan's recruiting efforts and cultivation of SNAs as inadequate.  (DSUF ## 18 & 19.)   The report stated that Rousan should have recruited 15 new agents by that point in the year but had only recruited two.  (DSUF #20.)   Bankers Life claims that Rousan crafted a plan in response to Koranda's visit to recruit more agents and cultivate more SNAs by improving training of new agents and increasing advertising, and that, in the plan, Rousan committed to developing 12 SNAs by the end of 2002.  (DSUF ## 21 & 23.)

Plaintiff argues that he believed the SNA program was a bonus program that provided a method to supplement income, not to measure performance.  (PSSUF #156.)   In deposition testimony, Klein described two company SNA programs: one was "a program to provide additional support to the branch sales office" in the amount of $1000 for each SNA achieved and the other was a year-end bonus for BSMs who reached a certain SNA goal.  (Klein Depo. at 54-56.)   Documents relating to SNA tracking that were produced by Bankers Life are entitled "BSM SNA Bonus Tracking" and "2003 Special BSM-SNA Bonus/Recognition."   (Bryant Declaration, Exs. P and Y.)   These were submitted to DFEH by Bankers Life.

Plaintiff also points out that the "Management by Objectives" Weekly Divisional Goal Report for Klein's division tracks applications, APCs, producing agents, and new agents but does not mention SNAs.  (PSSUF #160.)   The administrator for the Fresno office, Cathy Wallace, testified that the branch office received bonuses for SNAs developed but she did not know of any other SNA program.  (Wallace Depo. at 56-58.)   She also testified that the only company ranking reports she had seen ranked offices

and agents by APCs and not by any other criteria.  (*Id.* at 56.)
Bankers Life VP Carmella Storto testified that SNA goals were a
major criteria for branch manager performance but the only
document related to SNAs that she submitted to DFEH, entitled
"2003 Special BSM-SNA Bonus/Recognition," did not mention
performance.  (Storto Depo. at 68-74.)  She could not recall
whether she had seen any documents that reflected her
understanding that SNA goals were a major performance criteria
and, when asked how she came to the understanding, she said, "I
believe someone told me that."  (PSSUF #164.)

Rousan maintains that he recruited 10 new agents year-to-
date at the time of his termination.  (PSSUF #102.)  He had 8 new
agents on track for SNA status and 4 newly hired pre-contract
agents ready to be appointed.  (PSSUF ## 103 & 104.)

D.   2002 Performance Review and Termination.

Rousan produced three SNAs in 2002, which Bankers Life
claims was 25 percent of the annual goal.  (DSUF #25.)  Rousan's
office fell short of its 2002 APC goal by 11 percent, achieving
89 percent of the goal.  (DSUF #20.)  In February 2003, Klein
gave Rousan an overall rating of "inconsistent performer" in his
2002 performance review, which was the lowest rating, and noted
the office's productivity had fallen dramatically in the fourth
quarter.  (DSUF ## 29 & 30.)  In the review, Rousan wrote that he
did not achieve his 2002 SNA goal and fell short of achieving his
APC goal.  (DSUF #28.)  He also noted that he achieved 126
percent of the profit and loss goal.  (PSSUF #105.)  In the
"Manager Comments" section, Klein wrote:

**8**

> Met 89.1% of Goal with a 15% increase in APC's in 2002.
> Only developed 3 SNA's during the year. Yassir has
> grown this office by increasing the productivity of top
> performers, which fell dramatically in the fourth
> quarter. Yassir must recruit and develop new SNA's to
> bring consistency to this office. I will be monitoring
> new agent appointments and their field performance as
> it is imperative that this office generate at least 4
> SNA's this year by 6-30-03.

(DSUF #31.)

Bankers Life maintains that the interim goal of 4 SNAs by June 30, 2003 was less than the goal set by the home office of one SNA per month, or 12 total for the year.  (DSUF #32.)  As of June 30, the Fresno office had produced one SNA, which was short of the interim goal of 4 SNAs set by Klein.  (DSUF #34.)

Klein fired Rousan on July 15, 2003.  Bankers Life maintains that Rousan's failure to recruit and develop new agents led to a drop in production numbers for the Fresno office; it claims APCs measured in the first six months of 2003 were 26 percent less than APCs measured in the first six months of 2002.  (DSUF #40.) Bankers Life contends Klein replaced Rousan because his performance deteriorated over time;  Rousan was not meeting goals for performance, recruiting, and SNAs and the Fresno office showed a decline in analyzed premium growth and agent production credits.  (DSUF ## 42-44.)

Plaintiff asserts that he never received a written performance evaluation in the approximately thirteen years he worked at Bankers Life until the 2002 year-end performance review.  (PSSUF ## 74 & 76.)  Bankers Life Assistant Vice President Carmella Storto, in her 30(b)(6) deposition, testified that she was not aware of any written documents counseling or

disciplining Rousan regarding his performance other than the 2002 performance review and the termination letter.  (PSSUF #107.) Storto also testified that, besides the 2002 review, she had not seen any other performance evaluations for Rousan.  (Storto Depo. at 181.)

**E.    Company Ranking Reports**.

Rousan contends that company performance tracking reports demonstrate that he ranked average or better in a variety of rankings.  In the cycle rankings for June 16-30, 2003, which ranked branches within Klein's division by total APC, the Fresno branch ranked 9 out of 28.  (PSSUF #86.)  In the division's monthly rankings for June 2003, which also rank by total APC, the Fresno office ranked 14 out of 28 and it ranked 18 out of 28 in the monthly year-to-date ranking for the same month.  (PSSUF ## 87 & 89.)  In the composite year-to-date rankings for June 30, 2003, which rank by best performing office, the Fresno branch ranked 18 out of 28 within its division and 84 out of 148 nationally.  (PSSUF #88.)  In a composite rolling 12-month ranking as of July 31, 2003, the Fresno office ranked 19 out of 28 within its division and 81 out of 148 nationally for best performing office score.  (PSSUF #92.)

In the quarterly ranking report for April to June 2003, the Fresno office ranked 80 out of 148 nationally.  (PSSUF #94.)  In the monthly year-to-date report for June 2003, the Fresno office ranked 88 out of 148 nationally.  (PSSUF #95.)

During the last two weeks of Rousan's employment, the Fresno office was 12th out of 28 in total APCs.  (PSSUF #100.)  In his

10

last week, the Fresno office was 6 out of 28 in APCs.  (PSSUF #101.)  Rousan maintains that he demonstrated a strong upward trend in production during the last six months of his employment: from the first quarter of 2003 to the second quarter, APCs increased by 33 percent.  (PSSUF #97.)

F.    **Evidence of Discriminatory Intent**.

        There are at least two other Muslim BSMs currently working for Bankers in California.  There are more BSMs of Middle Eastern descent in Klein's territory than in any other region of Bankers Life.  On September 14, 2001, Klein sent an email to all BSMs, including Rousan, on the topic of the events of September 11, excerpted as follows:

> "…in this organization we have representatives from many different ethnic, religious, and cultural backgrounds. They are here because they love this country and they have struggled against incredible odds to establish lives here for themselves and their families. Unfortunately, at times like this, it is all too common that these individuals find themselves the victims of misguided hatred and prejudice. I would ask that each of you try to remain mindful of this and serve as an example to everyone in your organization by making sure that all of your people, regardless of their heritage or beliefs, know that they are a welcome part of this family."

(Klein Decl. at Ex. A.)


                        **III. DISCUSSION**.


A.    **Law Governing Claims Under The California Fair Employment**
        **and Housing Act**

        Plaintiff asserts a single claim for discrimination in violation of the California Fair Employment and Housing Act,

11

1  Government Code § 12900, *et seq.*   In discriminatory termination
2  claims, California courts apply the burden-shifting approach
3  established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,
4  802 (1973); *see Trop v. Sony Pictures Entertainment, Inc.*, 129
5  Cal.App. 4th 1133, 1144 (2005); *see also Guz v. Bechtel Nat.*
6  *Inc.*, 24 Cal. 4th 317, 354 (2000)("Because of the similarity
7  between state and federal employment discrimination laws,
8  California courts look to pertinent federal precedent when
9  applying our own statutes.").   As established by the United
10 States Supreme Court in *McDonnell Douglas*, plaintiff must first
11 establish the elements of a prima facie claim.   Specifically,
12 plaintiff must meet the following specific elements: (1) he was a
13 member of a protected class, (2) he was performing competently in
14 the position he held, (3) he suffered an adverse employment
15 action, such as termination, demotion, or denial of an available
16 job, and (4) some other circumstance suggests discriminatory
17 motive.   *Brandon v. Rite Aid Corp., Inc.*, 408 F. Supp. 2d 964
18 (E.D. Cal. 2006) (citing *Guz*, 24 Cal. 4th at 355).

19        If a plaintiff is able to establish a prima facie case, the
20 burden then shifts to the employer "to articulate some
21 legitimate, nondiscriminatory reason for the employee's
22 [termination].   The defendant need not persuade the court that it
23 was actually motivated by the proffered reasons.   It is
24 sufficient if the defendant's evidence raises a genuine issue of
25 fact as to whether it discriminated against the plaintiff."
26 *Mixon v. Fair Employment and Hous. Comm'n*, 192 Cal. App. 3d 1306,
27 1318-1319 (1987).   Once the employer provides evidence showing a
28 legitimate non-discriminatory reason for the termination, any

inference of discrimination disappears and the burden once again falls on the plaintiff to prove that the employer's proffered reasons are pretextual and dishonest. *Guz*, 24 Cal.4th at 356. Plaintiff must meet this burden with "evidence sufficient to permit a rational trier of fact to find the employer's explanation to be pretextual." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994). Mere proof of a prima facie case will not satisfy this requirement. *Id.* Nor will merely refuting the alleged reason for termination. *Id.*, citing *Davis v. Chevron U.S.A.*, 14 F.3d 1082, 1087 (5th Cir. 1994). The plaintiff must produce "specific, substantial evidence of pretext" to create a genuine issue of fact to avoid summary judgment. *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983).

B.    <u>Prima Facie Case</u>.

     Defendant argues Plaintiff cannot establish a prima facie case of discrimination because the undisputed facts establish that he was not performing his job duties competently and that Bankers Life did not have a discriminatory motive in firing him.

1.    <u>Job Performance</u>

     On the issue of job performance, Bankers Life contends Rousan's performance was severely lacking in three respects: overall production, recruiting, and cultivation of new agents. Defendant claims Rousan "was given clear objective goals to meet in 2002 and 2003 and he did not meet them." (Doc. 22 at 10.) Defendant contends Bankers Life gave him repeated warnings that he needed to improve recruiting, and that even after Klein

revised Rousan's SNA goal downward, Rousan failed to meet the
goal.  Defendant asserts Rousan has admitted he failed to meet
his goals but prior to termination, he sought to understate the
goals, minimized their importance and offered excuses for why
they were not met.  It further contends Rousan's office
experienced a 26 percent decline in production from the previous
year.

Bankers Life points to the performance of Rousan's
replacement, Farshad Asl, as evidence that Rousan's performance
was lacking and his excuses unreasonable.  Asl developed 8 SNAs
in less than six months and the Fresno office experienced a
corresponding increase in growth.

Plaintiff claims that Bankers Life presents only select data
that reflect negatively on his performance but ignores other data
that show his performance was satisfactory.  Specifically, he
claims that overall production was the bottom line used to
measure his performance and all BSM's performance, not SNA or
other rankings.  Plaintiff points to the annual growth rate for
the Fresno branch in 2002 as evidence that his production
increased – Plaintiff maintains the 2002 growth rate was 16
percent.  While his 2002 performance review states Plaintiff
increased APCs by 15 percent, whichever rate is cited represents
significant, double-digit growth.  He further claims his
production (measured in APCs) and income, which was tied to his
production, grew every year.  (PSSUF ## 80 & 82.)  In 2000,
Rousan earned $106,438.  (PSSUF #82.)  In 2001, Rousan earned
$112,126 and in 2002, he earned $146,835.  (*Id.*)  In 2003, Rousan
earned $83,099 working only six and a half months and claims he

1   was on track to early approximately $160,000.  (PSSUF #83.)

2       Rousan maintains that Bankers Life told him to celebrate if
3   APC annual growth was in the double digits.  (PSSUF #79.)  He
4   also contends that in the thirteen years he worked at Bankers
5   Life, production numbers were the most important factor in
6   determining whether to retain or fire an employee.  (PSSUF #75.)
7   Plaintiff argues that testimony from other Bankers Life employees
8   supports his view that production growth was the main metric used
9   to evaluate BSM performance.  When asked what level of growth was
10  acceptable for a BSM from year to year and whether there was a
11  specific percentage a BSM needed to reach to be considered a
12  consistent performer, Rousan supervisor Bill Klein answered,
13  "We're looking for growth."  (Klein Depo. at 65-66.)  Klein
14  explained that each branch has goals for growth set every year
15  but that he "would be more concerned with" showing an upward
16  trend in growth.  (*Id.*)  Another BSM, Bruce Baksis, who was
17  Rousan's regional director at the time of his termination,
18  testified that it was his understanding that a BSM who grew his
19  office between 7 and 15 percent was secure in his job.  (PSSUF
20  #78.)

21      Finally, Plaintiff claims that Defendant's company ranking
22  reports and documents it submitted to DFEH establish that SNAs
23  were not a central performance measure.  Plaintiff notes that the
24  company ranking reports rank BSMs in order of the amount of APCs
25  generated by each office and the growth rate, not by the number
26  of SNAs generated.  In addition, the documents Defendant
27  submitted to DFEH that relate to SNAs all refer to SNAs in the
28  context of a bonus program, specifically, as "BSM SNA Bonus

Tracking" and "2002 Special BSM-SNA Bonus/Recognition."  (Bryant Decl. at Exs. P & Y.)  Plaintiff contends that none of the documents Defendant produced that mention SNAs refer to it as a performance evaluation criteria.

There is no written evidence presented that details the performance criteria Bankers Life used to evaluate BSM performance.  Defendant contends that Rousan failed to meet his SNA goals for 2002 and notes that he admitted as much when he signed his 2002 performance review.  Defendant also maintains that Plaintiff was on notice that he was expected to improve his SNA performance.  Klein noted in Plaintiff's 2002 performance review: "Yassir must recruit and develop new SNA's to bring consistency to this office.  I will be monitoring new agent appointments and their field performance as it is imperative that this office generate at least 4 SNA's this year by 6-30-03." (Klein Decl. at Ex. F.)  Moreover, Klein sent Rousan an email in April 2002 in which he emphasized that Rousan must develop 12 SNAs that year.  (Klein Decl. at Ex. D.)  This evidence supports Defendant's argument that the number of SNAs was an important measure of BSM performance that was communicated to BSMs.

On the other hand, Plaintiff presents significant evidence that production growth was the main measure of performance.  His testimony and that of Klein and Baksis tends to show that growth was Bankers Life's main concern.  Plaintiff's 2002 performance review demonstrates that he increased APCs by 15 percent over the previous year, meeting 89 percent of his APC goal.  (Klein Decl. at Ex. F.)  His APCs increased each year from 2000 to 2002 and he was on track to increase them in 2003 before he was terminated.

(PSSUF ## 82 & 83.)

Moreover, Bankers Life's own company ranking reports focus on total APCs generated and APC growth, not SNAs.  Bankers Life argues several of the reports Rousan relies on refer to the Fresno office's low SNA rank.  These reports do refer to SNA rankings, as well as rank for SVA in the far right-hand columns; however they are all composite rankings which rank offices within Klein's division by "Best Performing Office" score in descending order.  The Best Performing Office score is calculated by factoring APC growth, 12-month APC levels, and adjusted revenue margin into a single metric.  It does not incorporate SNA rank.  Thus, an examination of the reports reveals they are centered around APC measurements and rankings.  Finally, the documents Defendant produced that relate to SNAs all refer to them in the context of bonus programs, not performance measurement.

Given the extensive evidence presented by both sides, it is clear there is a conflict over the criteria used by Bankers Life in measuring the performance of its BSMs.  Because there is a genuine dispute over the material issue of BSM performance measures, the issue of whether Rousan performed his job competently and in conformity with established goals is also in dispute.

2.   Discriminatory Motive

To establish a prima facie case, Rousan must provide evidence of a discriminatory motive.  *Brandon*, 408 F.Supp.2d at 964.  Bankers Life asserts the undisputed evidence does not support that Klein had a discriminatory motive in firing Rousan.

17

Defendant points to the fact that there are at least two other Muslim BSMs in Klein's territory and that Rousan testified he was treated fairly and free from disparaging remarks about his religion or national origin prior to September 11, 2001. Further, Defendant contends Rousan could not recall any statements made by Klein regarding persons of Middle Eastern ancestry or Muslim faith, except in an email Klein wrote to all BSMs on September 14, 2001.  According to Bankers Life, this email which Klein sent after the September 11th terrorist attacks contained a message of tolerance that extolled the virtues of the "different ethnic, religious and cultural backgrounds" of Bankers Life's employees and urged employees against "misguided hatred and prejudice" towards such individuals.  (Klein Decl. at Ex. A.)

Defendant characterizes Rousan's claim of harassment as "limited to no more than two 'looks' by Klein, an alleged wrong number, and a reprimand following a missed meeting."  (Doc. 22 at 12.)  Bankers Life maintains that Klein's reprimand of Rousan related to his failure to provide proper notice in advance of missing the meeting and that Plaintiff's accusations of discriminatory intent are "tenuous at best."

In response, Plaintiff points to a number of incidents at work from which he claims a jury could infer that he was terminated because he was an observant Muslim.  As an initial matter, Plaintiff claims Klein knew he was a Muslim and had observed him praying at work.  Rousan maintains he was observant of his religion at work, including celebrating Ramadan.  Klein talked openly at work about his Catholic faith.  During a company dinner meeting for managers, Klein stood to toast the invasion of

Iraq by the U.S. military and say a prayer for the troops. Everyone stood except Rousan.  Rousan contends Klein gave him a look as if to say, "what the heck are you doing? How come you are not toasting the army?"  Rousan claims he did not join the toast because it was against his religion.  Another time, Klein gave bottles of alcohol to managers at a meeting.  Rousan contends he refused to accept the bottle Klein offered him and instead went to the corner of the room and started praying.

Rousan also claims he was subject to adverse treatment by Klein after he refused to toast the Iraq invasion.  Rousan contends Klein gave him the cold shoulder during and after that company meeting, humiliated him by screaming and shouting at him on another occasion, and ordering him to apologize to other managers for going to the INS instead of attending a managers meeting.  Rousan asserts that Klein yelled at him and used profanity but did not yell at any other employees.

None of these incidents support Plaintiff's contention that Bankers Life had a discriminatory motive in firing him.  Klein's knowledge of Plaintiff's Muslim faith or observation of Plaintiff praying does not suggest any act of discrimination.  Plaintiff offers no real evidence to suggest he was treated unfairly because of his refusal to toast the Iraq invasion.  Without more, Plaintiff's interpretation of a "look" Klein gave him or vague accusation that Klein gave him the "cold shoulder" is not sufficient to suggest any discriminatory motive.  Nor is there any indication of discriminatory motive in Plaintiff's broad accusation that Klein yelled at him, without any description of the context of the incidents or what was said in the alleged

shouting match.

However, one incident on the day Plaintiff was terminated could suggest a discriminatory motive.  Rousan asserts that Bankers Life BSM Bruce Baksis, who was also Rousan's regional director, introduced Farshad Asl, Rousan's replacement, to the agents in the Fresno office as "a good Christian" after Rousan was fired.  While Defendant argues that Baksis played no role in the decision to terminate Rousan and thus any comments made by Baksis cannot support a finding of discriminatory intent, Defendant does not dispute that in a response to the DFEH it denied Baksis made the comment, but later reversed its position and admitted the comment was made.  Nor does Defendant dispute that Baksis was Rousan's regional director at the time of his termination.  Defendant explains that the comment by Baksis was made not to praise Asl for being a Christian, but to explain to the Fresno agents that as a Christian from Iran he had a lot of personal strength and character.

Plaintiff also contends that Baksis's and Klein's behavior on the day of his termination was suspicious.  As the new regional director, Plaintiff contends Baksis scheduled a meeting with him for July 15, 2003 to discuss how he could support him.  On that day, Baksis brought Asl, who was to be Rousan's new replacement, to the meeting with Rousan to learn about his success selling certain products.  After this meeting, Klein came to Rousan's office separately and terminated him as BSM.  Baksis claims he knew nothing about any plan to terminate Rousan, but Klein testified he told Baksis he was going to fire Rousan the day before.  Klein testified he spoke to Baksis at least two

times about terminating Rousan and specifically called him to discuss a strategy for the day of termination.

The contradictions in the testimony of Klein and Baksis over the day of Rousan's termination could suggest to a jury that Klein and/or Baksis are not being truthful about the reasons Rousan was terminated.  The fact that Baksis, when introducing Asl, mentioned that he was a Christian to the Fresno branch employees is circumstantial evidence of a potential for a discriminatory motive.

C.   **Parts II and III of the *McDonnell Douglas* Analysis**

Defendant argues that even if Plaintiff could establish a prima facie case of discrimination, summary judgment is warranted because Defendant satisfies the second step of the *McDonnell Douglas* analysis - it has produced evidence showing the action was taken for a legitimate, nondiscriminatory reason - but Plaintiff cannot meet the third test, which requires he present evidence that the decision to fire him was made on the prohibited basis of religion.

Once a plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises.  *Guz*, 24 Cal.4th at 355.  The burden then shifts to the employer to rebut the presumption by producing admissible evidence that permits the conclusion that there was a nondiscriminatory reason for the action.  *Id*. at 356.  If the employer sustains this burden, then the presumption is rebutted and the burden shifts to plaintiff to present evidence of pretexts for discrimination.  *Id*.

21

1    **1.   <u>Legitimate, Non-discriminatory Reason</u>.**

2         **As for the second test, Bankers Life claims the evidence**
3    **demonstrates that Bankers Life's actions were taken because of**
4    **deficiencies in Rousan's performance.   It points to "undisputed**
5    **shortfalls, including a persistent failure to meet agent**
6    **recruiting and development goals, and a corresponding decline in**
7    **production."   Bankers Life argues that the fact that Rousan was**
8    **terminated by the same person who hired him - Klein - is strong**
9    **evidence of a lack of discriminatory intent.   It points to**
10   *Coghlan v. American Seafoods* **for the "same actor" principle,**
11   **where the defendant is entitled to a "strong inference" of no**
12   **discriminatory motive if the person who hired the plaintiff is**
13   **the same person who terminated him.   413 F.3d 1090, 1096-97 (9th**
14   **Cir. 2005).**

15        **Defendant cites the same evidence and arguments in support**
16   **of its claim that it had a legitimate, non-discriminatory reason**
17   **to fire Rousan based on failures in Rousan's job competence.**
18   **Defendant argues its decision to terminate Rousan was based on**
19   **"objectively measurable performance issues," including failure to**
20   **meet agent recruiting and development goals.   However, the issue**
21   **of what performance criteria Bankers Life used to measure BSM**
22   **performance and its significance is in dispute as the evidence is**
23   **in conflict.   Defendant has presented evidence that SNAs were a**
24   **significant performance measure and that this was communicated to**
25   **Rousan.   Plaintiff has presented evidence that production growth**
26   **was the key measure and SNAs were only secondary measures that**
27   **were minimally tracked.**

28        **Because the material facts related to BSM performance**

**22**

criteria are in dispute, the question of whether Defendant had a
legitimate, non-discriminatory reason for terminating Plaintiff
is also in dispute because an evaluation of Plaintiff's
performance requires definition and application of the standards
used to judge the performance.

2.    Pretext.

        Once the employer provides evidence showing a legitimate
non-discriminatory reason for the termination, the presumption of
discrimination disappears and the burden once again falls on the
plaintiff to prove that the employer's proffered reasons "were a
mask for prohibited [] bias."  *Guz*, 24 Cal. 4th at 353.  To avoid
summary judgment, the employee must offer "substantial evidence
that the employer's stated nondiscriminatory reason for the
adverse action was untrue or pretextual, or evidence the employer
acted with a discriminatory animus, or a combination of the two,
such that a reasonable trier of fact could conclude the employer
engaged in intentional discrimination."  *Horn*, 72 Cal. App. 4th at
806-807 (quoting *Hersant v. Dept. of Social Servs.*, 57 Cal. App.
4th 997, 1001, 1004-05 (1997)).  This burden requires production
of evidence "supporting a rational inference that *intentional*
*discrimination, on grounds prohibited by the statute, was the*
*true cause* of the employer's actions."  *Guz*, 24 Cal. 4th at 361
(emphasis in original).  An issue of fact requires an
actual conflict in the evidence, and cannot be created by
speculation or conjecture.  *Horn*, 72 Cal. App.4th at 806.
Additionally, evidence that only supports a weak inference of
pretext will not satisfy the employee's burden, particularly in

23

1  light of a strong showing of innocent reasons by the employer.

2  *Guz*, 24 Cal. 4th at 362.  Merely challenging the wisdom or

3  correctness of the decision will not satisfy plaintiff's burden.

4  *Id.*, 24 Cal. 4th at 358; *Horn*, 72 Cal. App. 4th at 807.

5  　　When gauging a non-pretextual performance-related

6  termination for possible pretext, the Court's inquiry is "not a

7  determination of whether [plaintiff] was performing his job

8  adequately, but rather, whether there was sufficient evidence of

9  unsatisfactory performance to be a legitimate concern of his

10  employer."  *Douglas v. Anderson*, 656 F. 2d 528, 533, n. 5 (9th

11  Cir. 1981).

12  　　While it is not necessary to reach this issue because under

13  steps 1 and 2 of the *McDonnell Douglas* analysis, questions of

14  fact remain, it is informative to review the evidence related to

15  the issue of pretext.  Here Defendant argues Rousan cannot

16  present evidence that his termination was the product of personal

17  bias by Klein.  Defendant argues Rousan does not dispute he did

18  not meet the goals Bankers Life set for him.  Further, Defendant

19  claims no reasonable inference of bias can be drawn where other

20  BSMs were of the same religion as Rousan and six other managers

21  were replaced in the same time frame for the same reasons that

22  applied to Plaintiff.

23  　　Plaintiff claims several instances support an inference that

24  Defendant's proffered reasons for his termination are nothing but

25  pretext.  First, Plaintiff claims that Bankers Life changed its

26  stated reasons for terminating him in its responses to DFEH

27  questions.  In its initial response, Bankers Life told the DFEH

28  that Rousan was terminated for poor performance because he did

1  not generate enough SNAs.  The only documentation Bankers Life

2  attached to this response included a letter titled "2003 Special

3  SBM-SNA Bonus Recognition" program and the SNA Bonus Tracking

4  report.  In a later response to the DFEH, Plaintiff contends

5  Bankers Life changed its justification and stated Rousan was

6  terminated for "negative growth" in the first six months of 2003

7  as compared to the first six months of 2002.

8      Plaintiff also argues that he generated more APCs in the

9  first six months of 2003 than other offices for a total APC of

10  $158,446 generated.  He maintains that approximately half the

11  offices in Klein's division experienced negative growth during

12  the same time period but those BSMs weren't terminated, including

13  four offices taht experienced greater negative growth than the

14  Fresno office.

15      Plaintiff also claims that other BSMs failed to meet their

16  SNA goals but were not terminated.  Specifically, in Laguna

17  Hills, the BSM had no SNAs by June 2003 and he was not

18  terminated.  In the Camarillo branch, the BSM had only 1 SNA in

19  June 2003 and he was not terminated.  The Denver office had only

20  2 SNAs as of the same date and its BSM was not terminated.

21  Plaintiff argues the vast majority of BSMs in Klein's division,

22  23 of 28, had not met their year-to-date qualifying target level

23  for SNAs and they were not terminated.

24      Rousan also claims that Bankers Life misled DFEH when it

25  claimed it had terminated other BSMs due to performance failures.

26  Plaintiff asserts that Klein and Storto admitted at deposition

27  that none of the managers had been terminated, but rather, had

28  resigned for personal reasons.

1   From this evidence, a jury could reasonably infer that

2   Defendant's stated reasons for terminating Rousan are pretextual.

3   Bankers Life's inconsistent statements to DFEH regarding the

4   reasons Plaintiff was terminated and misstatements that others

5   were terminated for similar reasons when they in fact resigned

6   call into question the bona fides of stated reasons for

7   termination.  In addition, the fact that other BSMs with

8   similarly poor SNA performance were not fired supports an

9   inference of intentional discrimination.

10

11                          IV.  CONCLUSION.

12      For the foregoing reasons, Defendant's motion for summary

13   judgment is DENIED.

14

15   IT IS SO ORDERED.

16   Dated:    June 17, 2009                   /s/ Oliver W. Wanger
                                        UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

                                26